UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

|  |  |
|---|---|
| RICHARD WILLIAM CLEMENT | Case No. 07-33987-dof |
| d/b/a CLEMENT FARMS | Chapter 7 Proceeding |
| and KELLY LYNN CLEMENT | Hon. Daniel S. Opperman |
| f/k/a KELLY LYNN CALDWELL, | |
| Debtors. | |

_____/

CATTLE PRODUCTION SYSTEMS, INC.,
as successor in interest to Great Lakes
Credit Company, LLC,

     Plaintiff,

                                                 Adversary Proceeding
v.                                               Case No. 08-3019-dof

RICHARD WILLIAM CLEMENT
d/b/a CLEMENT FARMS,

     Defendant.

_____/

## Opinion

Plaintiff, Cattle Production Systems, Inc. ("Plaintiff"), initiated this adversary proceeding

seeking to have the debt owed to it by the Debtor, Richard William Clement ("Debtor"),

excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), § 523(a)(4) and

§ 523(a)(6). Debtor denies the Plaintiff's allegations and asserts that his obligation to Plaintiff is

dischargeable. The Court conducted a Trial in this matter on August 11, 2009. Witnesses that

testified at the trial included Mr. Jon Hansen, an employee of Cattle Productions Systems, Inc.,

Mr. Gary Labor, an independent contractor for the Plaintiff, Dr. Mary Schultz Megyesi, and the

Debtor. This matter was taken under advisement at the conclusion of the trial.

1

For the reasons stated in this Opinion, the Court denies Plaintiff's request to find its debt to be a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A) and (B) or 11 U.S.C. § 523(a)(4). The Court, however, holds that Plaintiff's debt is nondischargeable and excepted from discharge under 11 U.S.C. § 523(a)(6).

Jurisdiction

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E.D. Mich. LR 83.50(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Findings of Fact

Plaintiff's predecessor, Great Lakes Credit Company, LLC, entered into a Beef Feeding Agreement ("Agreement") with the Debtor and the Debtor's grandfather, Harry Clement Jr., on May 21, 2001. For many years, Debtor and his grandfather faithfully performed their duties under the Agreement. The basics of this Agreement were that Plaintiff entrusted cattle to the care of Debtor and his grandfather for finishing the cattle for beef purposes. From time to time, Mr. Gary Labor, an independent contractor for the Plaintiff, visited the Debtor's farm to inspect the cattle and to decide which cattle were ready to leave the farm.

Subsequent to their execution of the Agreement, the Debtor and his grandfather signed a financial statement disclosing their interest in real property and personal property, primarily farm inventory and equipment. The financial statement supplied by the Debtor and his grandfather indicated that the two of them had approximately $800,000 of equity in property with over $1,000,000 in total assets. As Debtor testified, many of the assets were owned by his grandfather, and unbeknownst to him, were actually held solely by Debtor's grandmother and

2

not his grandfather. Per the testimony of Mr. Jon Hansen, these financial statements led Plaintiff to believe that Debtor and his grandfather had significant assets and were thus suitable candidates for the Beef Feeding Program. If the assets had been properly disclosed, Mr. Hansen testified that the Debtor and his grandfather would not have received a high ranking and would have been unlikely candidates for the Beef Feeding Program.

Debtor successfully continued his work on behalf of Plaintiff even after the loss of his father in 2005 and his grandfather in 2007. In the summer of 2007, however, Debtor's operations took a drastic turn for the worse. Pursuant to the inventory reports filed by Debtor (Ex. 15), on June 16, 2007, the Debtor had approximately 215 head of cattle. Per the Debtor's testimony, the inventory reports are a very close approximation of the cattle on site and may vary because cattle, by their very nature, are sometimes difficult to count. Mr. Labor testified that on his August 15, 2007, visit to the Debtor's farm, however, only 34 head of cattle remained.

Debtor testified that during July and August 2007, a disease swept through his herd and killed approximately 168 head of cattle. Debtor testified that the cattle experienced scours and would then die. According to the Debtor, the death rate ranged from 5 to 8 head of cattle per day. Both Mr. Labor and Mr. Hansen testified that this death loss is extraordinary and certainly warranted consultation with any available expert, including a veterinarian. As Debtor testified, he treated the cattle with medications in a valiant attempt to ward off this unknown disease. Debtor also consulted with other family members, but did not consult with a veterinarian or other professionals with any type of animal or bovine husbandry expertise. Additionally, the Debtor did not advise Mr. Labor of the circumstances surrounding the health of the cattle even though he had the opportunity to do so as early as August, 2007. Per Debtor's testimony, he believed

that contacting Mr. Labor would not have been useful since Mr. Labor was already scheduled to visit Debtor's farm in mid August, 2007.

Upon his arrival on August 15, 2007, Mr. Labor noted the dramatic decline in the number of cattle and reported that decrease to his superiors. Mr. Labor was instructed to immediately remove the remaining cattle from the Debtor's farm. Mr. Labor did so and the remaining cattle were sold as soon as practicable.

After the sale of the cattle, Plaintiff's damages are $95,795.62, per Mr. Hansen's testimony. Additionally, Plaintiff claims damages for attorney fees and costs incurred in collecting this amount, which includes the negotiation and preparation of a Forbearance Agreement to secure the remaining obligation owed to Plaintiff. The Debtor executed the Forbearance Agreement and according to the Debtor's uncontradicted testimony, his grandmother refused to sign it.

Plaintiff claims that Debtor sold the cattle and failed to tender the proceeds to Plaintiff. In response, Debtor denies these allegations and claims that all of the cattle died. To prove that defense, Debtor, with employees and agents of Plaintiff observing, exhumed certain burial pits to demonstrate that the cattle had indeed died and were buried on the Debtor's farm. Both Plaintiff and Debtor produced a DVD recording a portion of these efforts. (Ex. 21 and Ex. A) At Trial, Dr. Mary Schultz Megyesi, a professor of anthropology at MSU, testified of the efforts taken on August 7, 2009, and August 9, 2009, to exhume the cattle. Summarizing Dr. Megyesi's testimony, she was able to match certain bones of the cattle to conclude that at least 15 animals were buried in one of the three burial sites. (Ex. 20) Per Debtor's testimony, he believes that 23

4

were buried in this area with another 25 to 35 buried in a second site, as well as 60 from a third site.

Analysis

Plaintiff claims the debt owed to it by Debtor is excepted from discharge by virtue of 11 U.S.C. §§ 523(a)(2)(A) and (B), (a)(4), and (a)(6). Since a different factual analysis is required for each subsection of 11 U.S.C. § 523, the Court takes each in order.

A.    Section 523(a)(2)(A)

Under 11 U.S.C. § 523(a), a debt may be excepted from a discharge granted under 11 U.S.C. § 727 —

> (2) for money, property,[1] services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

To prevail on a claim under 523(a)(2)(A), a plaintiff must show that:

> (1) [T]he debtor obtained money[, property, services, or an extension, renewal, or refinancing of credit] through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998). Whether a debtor possessed intent to deceive is measured by a subjective standard. *Id.*

The purpose of section 523(a)(2) is to prevent debtors from retaining the benefits of

---

[1]The term "property" as used in section 523(a)(2)(A) "denotes something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process." *Gleason v. Thaw,* 236 U.S. 558, 561 (1915).

5

property obtained through fraud. *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994).

Plaintiff must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498

U.S. 279, 286 (1991). Even so, the Court must construe all of the exceptions to discharge

strictly, and must give the benefit of the doubt to debtor. *Rembert,*141 F.3d at 281.

Intent, under *Rembert*, is measured subjectively. *Id.* A debtor intends to deceive a

creditor "when the debtor makes a false representation which the debtor knows or should have

known would induce another to advance goods or services to the debtor." *Bernard Lumber Co.*

*v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001). Fraudulent intent

requires an actual intent to mislead, which is more than mere negligence. . . A 'dumb but honest'

[debtor] does not satisfy the test." *Palmacci v. Umpierrez* (*In re Palmacci*), 121 F.3d 781, 788

(1st Cir. 1997)(citations omitted). A debtor's fraudulent intent

> may be inferred from the totality of the circumstances. The bankruptcy court must
> consider whether the totality of the circumstances' presents a picture of deceptive
> conduct by the debtor which indicates an intent to deceive the creditor.' The court
> may consider not only the debtor's conduct at the time of the representations, but
> may consider subsequent conduct, to the extent that it provides an indication of the
> debtor's state of mind at the time of the actionable representations.

*Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Col. 2002)(quoting *Groetken v.*

*Davis (In re Davis)*, 246 B.R. 646, 652 (B.A.P. 10th Cir. 2000)(citations omitted). "A creditor can

present proof of surrounding circumstances from which a [c]ourt can infer a dishonest intent."

*Commercial Bank & Trust Co., v. McCoy* (*In re McCoy*), 269 B.R. 193, 199 (Bankr. W.D. Tenn.

2001).

As explained by the court in *Haney v. Copeland (In re Copeland)*:

> Proving the [d]ebtor's intent to defraud is similar to proving the [d]ebtor's
> knowledge and/or recklessness as to the falsity of the representations made. Because
> intent is a purely subjective question, the court must examine the totality of the

6

[d]ebtor's actions to determine if she possessed the requisite intent to deceive the [p]laintiffs. Any benefit of the doubt must be resolved in favor of the [d]ebtor, as § 523(a)(2) is strictly construed in her favor.

291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003)(quoting *XL/Datacomp, Inc. v. Wilson (in re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir. 1994)).

Plaintiff 's theory under 11 U.S.C. § 523(a)(2)(A) is based on misrepresentations made by the Debtor leading up to the 2007 Forbearance Agreement and consists of the substantial financial losses it incurred from losing its property (i.e., cattle) and the expenses related to pursuing the Forbearance Agreement and the nondischargeability of its debt. Plaintiff contends that it agreed to enter into the Forbearance Agreement with the Debtor and his grandmother based on the Debtor's representations that the collateral being used to secure the outstanding debt to Plaintiff consisted of the real property owned by his grandmother, farm equipment owned by the Debtor that the parties agreed would be sold at auction, and 50 acres of corn crop that had been planted by the Debtor. Plaintiff alleges that the Debtor's representations about his grandmother's willingness to sign the Forbearance Agreement and the 50 acres of corn crop were false. The Debtor testified that he never told the Plaintiff that his grandmother would sign the Forbearance Agreement. Debtor further stated that his grandmother had a mind of her own and that he could not make her sign the document. As far as the 50 acres of crop, the Debtor initially tried to explain that his representation to the Plaintiff about the corn crop was merely a miscommunication. The Debtor, however, later admitted that he lied to the Plaintiff about his planting of the corn crop. Despite this fact, the Debtor testified that he intended to pay the Plaintiff when he signed the Forbearance Agreement.

The Court notes that the evidence in the record is insufficient to establish each of the four elements required under § 523(a)(2)(A). With regard to the first element, while the Debtor

admitted that he lied to the Plaintiff about the 50 acres of corn crop, the record is inconclusive about the Debtor's representation about his grandmother's intent to sign the Forbearance Agreement. It is undisputed that the Debtor's grandmother did not sign the Forbearance Agreement. The testimony at Trial revealed that discussions about the Forbearance Agreement only took place between the Plaintiff and the Debtor. There is nothing in the record to indicate that the Plaintiff engaged in any direct communication with the Debtor's grandmother about the the terms of the Forbearance Agreement and the real property being used as collateral. Even if the Debtor made the representation to Plaintiff about his grandmother, it is uncontradicted that the Debtor told the Plaintiff that his grandmother would not sign the Forbearance Agreement on the morning of the day the parties were to meet to execute the Forbearance Agreement. Despite this development, the Debtor and the Plaintiff entered into the Forbearance Agreement presumably based on the other items of collateral used as security. In weighing the evidence and observing the witnesses' testimony about the Debtor's misrepresentations, the Court concludes that on balance this element has been established.

As far as the second element – the Debtor's intent to deceive – the Court, after hearing testimony and observing the Debtor, concludes that he did not intend to deceive the Plaintiff. The Court did not hear sufficient testimony supporting the requisite intent mandated by *Rembert*.

With regard to the third element, the Plaintiff was required to prove that it justifiably relied on the representations made by the Debtor. The Court determines that the Plaintiff failed to meet its burden. The Court concludes that due to the nature of the parties' business relationship and the circumstances surrounding their involvement with one another, it was

8

incumbent upon the Plaintiff to engage in a more thorough investigation to protect its rights before it entered into the Forbearance Agreement with the Debtor. *Fields v. Mans*, 516 U.S. 59, 71, 74-75 (1995) (holding that § 523(a)(2)(A) requires justifiable but not reasonable reliance and explaining that "[i]t is only where, under the circumstances, the facts should be apparent to one of the [creditor's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own'") (citation omitted). There is nothing in the record to indicate that the Plaintiff dealt directly with the Debtor's grandmother about the terms of the Forbearance Agreement. Plaintiff's mere reliance on the representations made by the Debtor about his grandmother and her property is insufficient and not justifiable. The same result exists as to the Plaintiff's reliance on the Debtor's representations about the 50 acres of corn crop. The Plaintiff failed to introduce any evidence about an investigation it conducted to verify that the Debtor had actually planted 50 acres of corn, which could then be used as collateral to secure the indebtedness owed by the Debtor to the Plaintiff.

The final element consists of whether the Plaintiff's reliance was the proximate cause of its loss. The Court determines that the Plaintiff failed to prove that the cause of its loss stemmed from its reliance on the Debtor's representations to enter into the Forbearance Agreement. The evidence in the record indicates that the debt had already been incurred by the time the Debtor agreed to sign the Forbearance Agreement.

In conclusion, the Court determines that under the circumstances of the loss of a herd, coupled with other uncertainties, as well as his grandmother's last minute decision to not sign certain documents, the factual record is insufficient to support Plaintiff's claim. Plaintiff is not

entitled to judgment under 11 U.S.C. § 523(a)(2)(A).

B.    Section 523(a)(2)(B)

Section 523(a)(2) excepts from discharge debts incurred by

> (B) use of a statement in writing –
>
> > (i) that is materially false;
> >
> > (ii) respecting the debtor's or an insider's financial condition;
> >
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> >
> > (iv) that the debtor caused to be made or published with intent to deceive.

Subsections (A) and (B) of § 523(a)(2) are mutually exclusive.  A claim based on false financial statements must be brought under subsection (B) and the special conditions set forth in subsection (B) must be met.  4 COLLIER ON BANKRUPTCY ¶  523.08[1] at 523-42.1 (Alan N. Resnick & Henry  J. Sommer eds., 15 ed., rev. 2009).

To prevail on a § 523(a)(2)(B) claim, a plaintiff must establish the following elements regarding the writing:

> (i) that it is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive.

*See Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985).

A document that is "written, signed, adopted or used by the debtor" qualifies as a statement in writing under this section.  *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001).

10

Under the first element, a written statement is materially false if the information in it "offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." *Id.* (*citing In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985).

The second element requires that the statement refer to the debtor's financial condition.

The third element requires the plaintiff/creditor to establish reasonable reliance on the written statement. Reasonable reliance is not defined in the Bankruptcy Code. Case law generally holds that it is determined objectively based on the totality of the circumstances. *In re Michael,* 265 B.R. at 598.

> The determination of the reasonableness of the creditor's reliance on a false statement in writing is judged by utilizing such factors as:
>
> • whether there had been previous business dealings between the debtor and the creditor;
>
> • whether there were any warnings that would alert a reasonably prudent person to the debtor's misrepresentations;
>
> • whether a minimal investigation would have uncovered the inaccuracies in the debtor's financial statements; and
>
> • the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating creditworthiness.

*Id.* at 598-99 (citations omitted).

The fourth element requires that the debtor make or publish the statement with "intent to deceive."

> The standard . . . is that if the debtor either intended to deceive the [b]ank or acted with gross recklessness, full discharge will be denied. . . . That is, the debtor must have been under some duty to provide the creditor with his financial statement; but full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth.

*Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985)(citations omitted).

Plaintiff's claims under 11 U.S.C. § 523(a)(2)(B) are based on the incorrect financial statements given by the Debtor and his grandfather in 2001. As developed at Trial, real estate that Plaintiff thought Debtor and his grandfather owned was actually owned by Debtor's grandmother. Other statements about the value of Debtor's property appear overstated as well. As testified by Mr. Hansen, Plaintiff's predecessor gave a high positive rank to Debtor and his grandfather based on these financial statements. Plaintiff claims that but for this rank, Plaintiff would not have entered into the Agreement.

A number of facts discredit the Plaintiff's claims. First, Debtor testified that he believed that his grandfather and grandmother owned the real estate together, and that his grandfather believed this as well. Moreover, Debtor did not think he owned this real estate, and did not believe that he represented that he owned the property listed in the financial statements. In fact, the reading of these financial statements urged by Plaintiff is technical and based on hindsight. The Court did not hear sufficient testimony to support a finding that the Debtor intended to deceive the Plaintiff as required under § 523(a)(2)(B).

Second, Plaintiff failed to demonstrate the requisite reliance on the financial statements. Assuming arguendo that the Debtor did intentionally mislead Plaintiff, the facts in the record are devoid of the type of reliance that resulted in the damages here. The evidence indicates that the Plaintiff did not avail itself of any public records to check the status of the ownership of the real estate. The records establishing the ownership of the real estate are generally and easily available at the Register of Deeds, but Plaintiff did not look at those records. If Plaintiff had

12

done so, it would have easily discovered the inaccuracies in the financial statements. This point was established by Mr. Hansen's testimony. As Mr. Hansen stated during the Trial, the Plaintiff subsequently conducted a title search and learned that neither the Debtor or his grandfather own any real property worth $800,000. In addition, the alleged false statements were made in 2001, about six years before Plaintiff incurred these losses. In those six years, the Debtor performed according to the contract and with an apparent financial wherewithal to be a suitable contractual party. The passage of this time, therefore, undercuts Plaintiff's actions. This is especially true when Plaintiff's agents routinely checked Debtor's herd head count and otherwise inspected Debtor's operations. Plaintiff is not entitled to judgment under 11 U.S.C. § 523(a)(2)(B).

C.     Section 523(a)(4)

A debt will be determined to be nondischargeable if it is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). If "fraud or defalcation while acting in a fiduciary capacity" is at issue, the Sixth Circuit adopted a narrow definition of the requirement that the debtor act in a "fiduciary capacity" in the case of *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176 (6th Cir. 1997). The *Garver* court held that the term "fiduciary capacity" "implies the existence of an express or technical trust relationship," requiring that "the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4)." *Id.* at 179. *See also Board of Trustees of the Ohio Carpenters' Pension Fund v. Bucci* (*In re Bucci*), 493 F.3d 635, 639-40 (6th Cir. 2007) (stating the elements that a creditor must prove to establish the existence of an express or technical trust).

The burden is on the plaintiff to prove by a preponderance of the evidence that the debt

13

should be excepted from discharge under Section 523(a)(4), and thus the creditor has the burden

of proving the debtor engaged in "fraud or defalcation while acting in a fiduciary capacity." *See*

*Grogan v. Garner*, 498 U.S. 279 (1991); *Meyers v. IRS* (*In re Meyers*), 196 F.3d 622 (6th Cir.

1999). "A debt is nondischargeable as a defalcation when the preponderance of the evidence

establishes: (1) a preexisting fiduciary relationship; (2) breach of that fiduciary relationship; and

(3) a resulting loss." *In re Bucci*, 493 F.3d 635, 639 (6th Cir. 2007) (quoting *Commonwealth*

*Land Title Co. v. Blaszak* (*In re Blaszak*), 397 F.3d 386, 390 (6th Cir. 2005)).

The claims in this Count of Plaintiff's Complaint are based on the relationship between

Plaintiff and Debtor and Debtor's duty to care for the animals.[2] Initially, the Court notes that the

duty is contractual, and that the circumstances are unusual, but not clearly within the confines of

a classic fiduciary relationship, which often involves a degree of trust and an impaired party,

such as an incapacitated adult or a minor. Here, the relative bargaining power of the parties is

equal, or weighing in favor of Plaintiff. Although the Court is not holding that a necessary

fiduciary relationship cannot be created from a contract for commercial gain, the Court does hold

in this case the facts are such that this relationship is insufficient to establish "fiduciary capacity"

under federal law for purposes of § 523(a)(4). *In re Bucci*, 493 F.3d at 642 (recognizing that

"the Sixth Circuit has repeatedly construed 'the term 'fiduciary capacity' found in the

defalcation provision of § 523(a)(4) more narrowly than the term is used in other

circumstances'" and pointing out that a creditor must prove the existence of an express or

---

[2]While the Plaintiff's allegations in its Complaint sufficiently pled an embezzlement or larceny theory of liability for Section 523(a)(4) purposes, the Plaintiff did not advance this theory in its Amended Pre-Trial Statement or at the Trial. The Court concludes that it is now waived. *Olsen v. American Steamship Co.*, 176 F.3d 891, 897 (6th Cir. 1999) (citation omitted).

14

technical trust).  The Court therefore concludes that Plaintiff is not entitled to a judgment under § 523(a)(4).

D.    Section 523(a)(6)

Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity."  The exceptions to discharge are to be narrowly construed in favor of the debtor.  *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S.*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v. Tuttle (In re Tuttle)*, 224 B.R. 606, 610 (Bankr. W.D. Mich. 1998) ("Courts will narrowly construe the language of § 523 to assure the debtor has an opportunity for a fresh start.")  A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious.  *Grogan v. Garner*, 498 U.S. 279 (1991).

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the U.S. Supreme Court discussed and determined the meaning of the language used in 11 U.S.C. § 523(a)(6).  The issue before the U.S. Supreme Court involved "whether a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6).  *Id*. at 59.  The Kawaauhaus argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury.  *Id*. at 61.

In analyzing the parameters of the language "willful and malicious injury," the Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not

> merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act," not simply "the act itself*."

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The Supreme Court further determined that to adopt the interpretation proposed by the Kawaauhaus would:

> place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . . A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge "should be confined to those plainly expressed.'

*Id*. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in § 523(a)(6), in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit Court of Appeals interpreted *Geiger* and noted that:

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id*. at 464.

Based on the language used and analysis of the Supreme Court in *Geiger*, the *Markowitz*

court announced the standard of the Sixth Circuit by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id.* (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *see also Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)). If a party fails to prove either willful or malicious, the debt will be discharged. *Markowitz*, 190 F.3d at 463. Inferences can be made, however, if the circumstances surrounding the alleged injury warrant such.

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind. A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000).

Both Plaintiff and Debtor agree that Debtor had 215 cattle on June 16, 2007, but that only 34 remained on August 15, 2007. Although a number of explanations exist for this loss, the Court concludes that it need not determine the actual reason for this loss.

Debtor claims that beginning in July 2007, the herd was ravaged by a disease that killed 168 cattle. During that time, Debtor tried to treat the cattle by himself or with advice of family members. He did not contact anyone with a background in animal husbandry or a veterinarian.

Likewise, Plaintiff was not notified of the situation by the Debtor.

The Court finds that such a catastrophic loss forms the basis for the willful and malicious injury envisioned by *Markowitz*. Debtor's actions were such as to be substantially certain to result in an injury to the Plaintiff. When the cattle started dying, the continued ineffective medical treatment of those remaining cattle resulted in their substantially certain deaths. Debtor did nothing more to stop the loss. Debtor tried to explain his actions or inactions by claiming shame and embarrassment. If true, personal feelings do not supplement the duty to seek help or to timely inform the Plaintiff of the situation to enable it to protect its property.

The Court infers from these circumstances, including the significant loss of the herd over a short period of time, coupled with a failure to act when prior efforts were ineffective, to be a willful and malicious injury to Plaintiff that is excepted from discharge. Plaintiff's damages as a result of the loss of cattle is $95,795.62, and Plaintiff is entitled to judgment in the amount of $95,795.62, plus costs and statutory interest under § 523(a)(6).

Plaintiff is directed to submit a pleading detailing the costs and a proposed judgment consistent with this Opinion.

cc:     Richard Clement

```
Signed on October 23, 2009

                                    /s/ Daniel S. Opperman
                                Daniel S. Opperman
                                United States Bankruptcy Judge
```

18